Stephen R. BURCH; Margaret R. Burch, Plaintiffs–Appellees,

v.

FEDERAL INSURANCE ADMINISTRATION, and its Director; Federal Emergency Management Agency, Defendants–Appellants.

No. 93–1749.

United States Court of Appeals, Fourth Circuit.

Argued March 7, 1994.

Decided May 5, 1994.

**ARGUED:** Michael Scott Raab, Civ. Div., U.S. Dept. of Justice, Washington, DC, for appellants. David James Irvine, Jr., Pritchett, Cooke & Burch, Windsor, NC, for appellees.

**ON BRIEF:** Frank W. Hunger, Asst. Atty. Gen., James R. Dedrick, U.S. Atty., Barbara L. Herwig, Civ. Div., U.S. Dept. of Justice, Washington, DC, for appellants. Lars P. Simonsen, Pritchett, Cooke & Burch, Windsor, NC, for appellees.

Before WIDENER and WILKINSON, Circuit Judges, and BRINKEMA, United States District Judge for the Eastern District of Virginia, sitting by designation.

Reversed by published opinion. Judge WILKINSON wrote the opinion, in which Judge WIDENER and District Judge BRINKEMA joined.

## OPINION

WILKINSON, Circuit Judge:

This case requires us to decide whether state certification of structures to be relocated under the National Flood Insurance Act of 1968, 42 U.S.C. § 4001 *et seq.*, divests the Federal Emergency Management Agency of final decisionmaking authority with regard to those structures. We hold that FEMA, the federal entity charged with administering the Act, retains final authority to decide whether property owners qualify for federal relocation benefits and whether they have moved their structures far enough from the threatened harm to maintain federal flood insurance coverage. We further decide that substantial evidence supports FEMA's decision that plaintiffs here had not relocated their beach house far enough from the ocean to qualify for continued federal flood insurance. We therefore hold that the plaintiffs may no longer avail themselves of federal flood insurance coverage for the house, and reverse the district court's judgment to the contrary. *See Burch v. Director, Fed. Ins. Admin.,* 818 F.Supp. 142 (E.D.N.C.1993).

### I.

Plaintiffs Stephen and Margaret Burch own an ocean-front home in Nags Head, North Carolina. The Burches secured federally-backed flood insurance for their home under the National Flood Insurance Program ("NFIP"). This program was established pursuant to the National Flood Insurance Act of 1968 (the "Act").

The Burch house was originally located forty feet landward from the first line of stable natural vegetation along the beach. In the spring of 1990, the Burches became concerned that continuing erosion at the

beach-front put their property in danger of flooding. The Burches therefore contacted the North Carolina Division of Coastal Management ("DCM") regarding financial assistance for relocating the house. Under the Act, the Burches would be eligible for federal relocation assistance if their home was "subject to imminent collapse or subsidence as a result of erosion or undermining caused by waves or currents of water exceeding anticipated cyclical levels." 42 U.S.C. § 4013(c)(1).

DCM eventually found that the Burch house fell within the "zone of imminent collapse." *See* 44 C.F.R. §§ 59.1 & 63.17. Initially, DCM determined that the Burch home did not meet the mathematical formula for the zone set forth in 44 C.F.R. § 59.1. Under that section, the zone begins at a "reference feature" and extends landward a distance of five times the "average annual long-term erosion rate for the site" plus ten feet. 44 C.F.R. § 59.1. For the Burch property, that "reference feature" was the first line of stable natural vegetation along the beach. Using an average annual long-term erosion rate of three feet per year—the erosion figure published by the state for the Nags Head area where the Burch home was located—DCM calculated that the zone of imminent collapse extended landward a distance of twenty-five feet from the first line of stable vegetation. Because the Burch home was forty feet landward, it could not qualify under 44 C.F.R. § 59.1.

The imminent collapse zone is not an inflexible regulatory concept, however. Under 44 C.F.R. § 63.17(b)(6), which allows consideration of "unusual erosive or stability conditions" at a site, DCM found that the Burch property was at special risk from storm overwash because of its low elevation and the absence of a frontal dune protecting it from the ocean. Using this exception, DCM decided that the zone of imminent collapse extended landward forty feet, placing the Burch house within the zone.

Plaintiffs, apparently believing that this DCM decision guaranteed their federal relocation benefits, also consulted DCM regarding the appropriate place to relocate their home. The Burches could maintain their eligibility for federal flood insurance coverage only if they moved their home to the 30-year setback. 42 U.S.C. § 4013(c)(5). The 30-year setback is the point landward from the reference feature equal to thirty times "the average annual long term recession rate."[1] 44 C.F.R. § 59.1. In making this calculation, DCM used the average annual long-term erosion rate of three feet per year published by the state as the recession rate and informed the Burches that the 30-year setback was ninety feet from the vegetation line.

With this information in hand, the Burches took two steps. First, on September 24, 1990, they filed a claim for federal relocation benefits with FEMA. Second, they moved their home to a point ninety feet landward from the first line of stable vegetation along the beach. On March 6, 1991, the Burches received unhappy news from FEMA. FEMA informed them that it had not relied on the three feet per year erosion rate published by the state of North Carolina because that rate "underestimates the degree of the erosion threat at the site." FEMA did approve a $32,100 relocation payment to the Burches, stating that the original position of the house placed it within the zone of imminent collapse. However, FEMA also explained that its calculation indicated that the house needed to be placed 180 feet from the vegetation line to be at the 30-year setback.[2] Because the Burch home had been moved to a point only ninety feet from the vegetation line, FEMA concluded that "your structure at the new site will not be eligible for flood insurance coverage under the National Flood Insurance Program."

The Burches then brought suit against FEMA in North Carolina federal court, claiming that the rejection of their federal

---

1. Although the definition of imminent collapse refers to an "erosion" rate and definition of 30-year setback refers to a "recession" rate, for all practical purposes, they mean the same thing here.

2. Although the FEMA letter does not specifically articulate the erosion rate used, given the regulatory formula, that erosion rate had to be six feet per year.

flood insurance coverage was in error. The district court entered judgment in favor of the Burches. *Burch v. Director, Fed. Ins. Admin.*, 818 F.Supp. 142 (E.D.N.C.1993). In essence, the district court held that FEMA had unjustifiably relied on two different erosion rates in determining the zone of imminent collapse and the 30–year setback. First, the district court explained, FEMA did not contest the DCM finding regarding imminent collapse. The court noted that the DCM determination was based on an average annual long-term erosion rate of three feet per year, and that DCM found the Burch house to be in the zone of imminent collapse only because of the unusual erosive conditions. Because FEMA had validated DCM's imminent collapse finding, the district court held that FEMA had also accepted the three feet per year figure as the average annual long-term erosion rate for the site. The district court therefore decided that FEMA's attempt to calculate the 30–year setback based on a six feet per year rate was impermissible, and ordered the agency to provide insurance coverage to the Burches. FEMA now appeals.

## II.

Because the outcome of this case depends on the interpretation of the National Flood Insurance Act of 1968, we begin our analysis with that statute and its regulations. Congress passed the Act to make it possible for people living in high risk flood areas to afford insurance "through the cooperative efforts of the Federal Government and the private insurance industry." 42 U.S.C. § 4001(d); *see* H.REP. NO. 1585, 90th Cong., 2d Sess. (1968), *reprinted in* 1968 U.S.C.C.A.N. 2873, 2965–73. The original Act provided no encouragement for property owners to relocate before damage to their property actually occurred. In fact, because money was paid out only for actual loss, even property owners faced with inevitable flooding would often wait for that flooding to occur in order to collect federal insurance benefits. *See* 133 CONG.REC. H4501 (daily ed. June 11, 1987) (remarks of Rep. Jones) (noting that the Act has created "a disincentive for homeowners to move away from flood- or erosion-prone

areas before a storm actually destroys their houses").

This problem was addressed by the Upton–Jones Amendment. *See* Housing and Community Development Act of 1987, Pub.L. No. 100–242, § 544, 101 Stat. 1815, 1940–42 (1988) (codified at 42 U.S.C. § 4013(c)). Under this amendment, property owners can receive monetary assistance for moving structures threatened by "imminent collapse or subsidence." 42 U.S.C. § 4013(c)(1); *see* H.R.CONF.REP. NO. 100–426, 100th Cong., 1st Sess. 237–38 (1987), *reprinted in* 1987 U.S.C.C.A.N. 3458, 3534–35. However, in order to maintain federal flood insurance for a relocated structure, the structure must be moved beyond an established erosion setback. 42 U.S.C. § 4013(c)(5). These setbacks—defined in § 4013(c)(5) as a 30–year erosion setback for structures up to four dwelling units and a 60–year erosion setback for all other structures—are calculated by multiplying the time of the setback by the "average annual long term recession rate." 44 C.F.R. § 59.1. As the House Conference Report explains, this new provision was designed to decrease flood damage and the concomitant insurance payouts necessary under the program:

> Through advance identification of imminently threatened structures, structural collapse and total loss claims under the NFIP can be avoided. Thus, the conferees do not expect this provision will result in a net increase of claims under the NFIP, nor significantly increased costs to the taxpayer.
>
> To the contrary, ... the value of claims can be significantly reduced by encouraging relocation of threatened structures. Moreover, the total number of claims should decline as highly exposed structures are relocated beyond the erosion setbacks required under paragraph (5), thereby mitigating the potential for future repetitive claims.

1987 U.S.C.C.A.N. at 3535 (The House Conference Report was submitted to both the House and the Senate as an explanation of the legislation.); *see also Foster v. Federal Emergency Management Agency*, 984 F.2d 128, 130 (4th Cir.1993).

In order to advance the process of certifying structures facing imminent collapse, the

Upton–Jones Amendment provides that "an appropriate State or local land use authority" may participate in imminent collapse certifications. 42 U.S.C. § 4013(c)(1). The regulations promulgated under this section lay out the criteria states must meet in order to gain the authority to make such determinations. 44 C.F.R. § 63.14. The regulations also mandate the collection of certain scientific and technical data during the certification process, including pictures showing the structure in relation to the peril it faces and identifying the relevant beach reference features. *Id.* § 63.17. After this data is collected, the state must provide it to the insured, who then submits the data to FEMA when making an insurance claim for relocation benefits. *Id.*

In this case, it is undisputed that North Carolina had the authority to participate in imminent collapse determinations under the Upton–Jones Amendment and that it acquired the data necessary to make such a determination for the Burch property.

## III.

### A.

The Burches contend that North Carolina's authority to make imminent collapse determinations is dispositive of the question here. They argue that under the Act and its regulations, FEMA is required to accept individual imminent collapse determinations made by a state unless it finds the state's entire certification program inadequate. Where, as here, FEMA is not attacking the adequacy of the state program as a whole, the Burches contend it must accept the state's determination regarding the average annual erosion rate for a particular site. Under the three feet per year erosion rate set by the state, the Burches' relocated home would be at or beyond the 30–year setback and still eligible for federal flood insurance.

We are not persuaded. The average annual long-term erosion rate central to the imminent collapse decision and the average annual long-term recession rate central to the setback decision are both federal terms that may be determined by FEMA itself after review of relevant scientific and technical data for a site. Indeed, the pertinent statutory and regulatory language plainly speaks to this result. The statute provides that relocation payments shall be made "following a final determination by [FEMA] that the claim is in compliance with" the relevant regulations. 42 U.S.C. § 4013(c)(1). The regulations likewise state that "after a claim has been filed by the property owner," FEMA "will review the certification and data prepared by the State" and declare that the structure (1) "has been determined to be subject to imminent collapse," (2) "has not been determined to be subject to imminent collapse and the basis for such determination," or (3) that more data is needed to make the imminent collapse certification. 44 C.F.R. § 63.18. These provisions make clear that the final determination regarding imminent collapse certification lies with FEMA, and that FEMA may pass on state certifications on a case-by-case basis. This result necessarily means that FEMA also has the ability to decide, on its own, the erosion rate for a particular site and to apply that rate for purposes of both the imminent collapse and the setback calculations.

This reading of the Act is entirely consistent with its legislative history. Representative Jones, a co-author of the Upton–Jones Amendment, explained that:

> The process of identifying threatened structures begins at the State or local level. Using the FEMA regulations for guidance, State or local land use agencies will be able to make a preliminary identification of structures which are subject to imminent collapse. That agency will then submit a certification which will initiate consideration by FEMA. This role for State and local land use agencies is designed to speed the identification process and to provide the Director with information needed in making a final determination.

133 CONG.REC. E4546 (daily ed. Nov. 19, 1987). The House Conference Report likewise indicated that "local level involvement will help speed the identification process and will provide[FEMA] with information needed in making a final determination." 1987 U.S.C.C.A.N. at 3535.

Clearly, then, while the Upton–Jones Amendment does contemplate state assistance in making the necessary scientific find-

ings, it confers no authority on the states to make final determinations regarding relocation of structures insured under the NFIP and threatened by flooding. In vesting final authority with FEMA, Congress intended that administration of the National Flood Insurance Program remain uniform and not depend on the content of the coastal management laws of the individual states. *See id.;* 133 CONG.REC. H4501 (daily ed. June 11, 1987) (remarks of Rep. Jones).

## B.

Given that final authority to make imminent collapse and setback determinations lies with FEMA, it remains only to inquire whether FEMA failed to meet any statutory or regulatory obligation in the course of its determinations. We conclude that it did not.

The district court held that FEMA erred in using different erosion rates for the two calculations it made regarding the Burch property. The district court's finding was based on the erroneous legal conclusion that, if FEMA accepted the state's imminent collapse determination, it had to accept the erosion rate the state used in making that calculation. However, given that final authority to make the imminent collapse determination lies with FEMA, nothing prevents that agency from reaching the same conclusion as the state agency but basing that conclusion on a different erosion rate. That is exactly what occurred in this case.

FEMA did not arbitrarily select its own erosion rate. The state had submitted aerial photographs of erosion around the Burch property along with data from the University of Virginia indicating the historic storm overwash for the area. In addition, FEMA evaluated National Oceanic and Atmospheric Administration information and other historic flood data published by the Federal Insurance Administration. All the data tended to show that a six feet per year erosion rate more accurately reflected the conditions at the Burch property.

■ After evaluating this data, FEMA independently determined the average annual long-term erosion rate for the Burch property to be six feet per year. Using this rate, the zone of imminent collapse for the Burch property was forty feet—five times the annual erosion rate plus ten feet. 44 C.F.R. § 59.1. It was not necessary, therefore, for FEMA to rely on the "unusual erosive or stability conditions" language of 44 C.F.R. § 63.17, as the state did, to find that the Burch property was within the zone. The six feet per year erosion rate also obviously dictated a 30–year setback of 180 feet. *See id.* § 59.1.

When the same stretch of shoreline is involved, it makes sense to use the same erosion rate to calculate both the zone from which a threatened structure should be moved and the safe setback distance to which it should be relocated. Nothing in the regulations precludes the use of the same rate for both determinations. *See* 44 C.F.R. § 59.1. Here, FEMA did use the same six feet per year rate for both the imminent collapse and the setback determinations. The fact that FEMA itself chose the applicable rate after evaluating the relevant data fully comports with the Upton–Jones Amendment to the National Flood Insurance Act of 1968.

## IV.

■ Finally, we must note that we are unimpressed with the equitable case plaintiffs have attempted to make here. The Burches would have this court decide that their property faces a short-term erosion rate of six feet per year but a long-term rate of only three feet per year. This holding would create the longest possible extension of the zone of imminent collapse, thus allowing the Burches to recover relocation payments, while at the same time allowing them to move their federally insured home the shortest distance from its original location. The most likely result of such a holding would be that the Burch house would soon again be threatened by beach erosion, thereby requiring another costly relocation payment. Such a result would only frustrate the intent of the Upton–Jones Amendment that relocated homes be moved out of harm's way. Had the Burches chosen to wait for FEMA's final determination regarding their claim, they could have moved their home to a distance that comported with congressional intent. The view of the agency charged by Congress with administration of the Act is simple: the Burches received federal payments to relocate their home, yet it stands

too close to the ocean still. The Burches may not now receive federal flood insurance coverage, and the judgment of the district court reinstating that coverage is therefore

*REVERSED.*